```
 1 | ROGER S. THOMPSON
   | MORRISON LAW FIRM
 2 | 145 North Fifth Avenue
   | Mount Vernon, New York 10553
 3 | (914) 667-6755
 4 | BART L. KESSEL
   | ARTER & HADDEN
 5 | 700 South Flower Street, 30th Floor
   | Los Angeles, California  90017-4250
 6 | (213) 629-9300
 7 |
 8 | Attorneys for Plaintiff
   | Robotic Vision Systems, Inc.
 9 |
10 |
11 |
12 |                UNITED STATES DISTRICT COURT
13 |                CENTRAL DISTRICT OF CALIFORNIA
14 |
15 | ROBOTIC VISION SYSTEMS, INC.,  )   CASE NO. CV 95-1882 LGB
                                   )   (RMCx)
16 |          Plaintiff,            )
                                   )   DECLARATION OF ROGER S.
17 | vs.                            )   THOMPSON
                                   )
18 | VIEW ENGINEERING, INC.,        )
                                   )
19 |          Defendant.            )
                                   )
20 |
21 |
22 |      I, Roger S. Thompson, Esq., declare as follows:
23 |
24 | 1.   I submit this Declaration in opposition to the motion by
25 | View Engineering, Inc. ("View") for sanctions under F.R.Civ.P.
26 | 11.
27 |
28 |
```

BLK00916

A - 178

2.   I am an attorney admitted before the State and Federal Courts of the State of New York, and am trial patent counsel to the Defendant, Robotics Vision Systems, Inc. ("RVSI") herein. I am with the Morrison Law Firm ("the Firm"), RVSI's intellectual property counsel.

3.   I am a graduate of Columbia University, receiving therefrom my Bachelor's of Science in Electrical Engineering, from the School of Engineering and Applied Science, and my J.D. from the School of Law, both in 1978 (a combined degree program). From my graduation, I have worked exclusively as a patent attorney for law firms in and around New York City. I have been with the Firm since 1984.

4.   The Firm commenced its representation of RVSI in early 1995, with some general patent matters. The Firm's principal, Thomas R. Morrison, Esq., was primarily responsible for the patent matters for RVSI at that time, with associate attorneys becoming more involved as RVSI sent more work to the Firm.

5.   Although I am a practicing and registered practitioner before the Patent and Trademark Office, I spend most of my time as head of litigation and head of trademarks for the Firm.

6.   Early on in our representation of RVSI, RVSI approached the Firm about a possible infringement of one of its patents, U.S. Pat. No. 4,238,147 ("the '147 patent") by a competitor, View.

1  Mr. Morrison was contacted by Mr. Howard Stern of RVSI, and asked
2  our opinion regarding infringement. Mr. Stern advised us that,
3  based upon his limited knowledge of View's actual machines (since
4  View's machines were not available for actual inspection), he
5  could not tell us for certain what they did.

7.  He did tell us, however, that, based upon what he knew of View's machines from a review of their advertising, literature and patents, together with his knowledge of physics, and the structure and operation of machines in this field, he was convinced that it was highly probable that View's machines practiced the invention of the '147 patent. Mr. Stern spent some time discussing this issue with Mr. Morrison, and Mr. Morrison and I discussed the issue.

8.  Based upon these discussions, and Mr. Stern's conviction of what View did, Mr. Morrison prepared a letter to Mr. Pat Costa, then President of RVSI, advising that he felt View was infringing the '147 patent. Upon information and belief, Mr. Costa then provided a copy of that letter to View. That is the letter which View used as a basis for commencing the instant Declaratory Judgment action.

9.  At about this time, View filed the instant action, but did not inform RVSI that it had been sued. Not knowing about the suit, RVSI attempted to resolve what it thought was merely a

business dispute with View, businessman-to-businessman. The Firm was not directly involved.

10. The Firm became involved, however, when contacted by Mr. Stern about a meeting that had been scheduled with View. Mr. Stern informed us that he had been in discussions with View, and had scheduled a meeting to discuss the technical aspects of the '147 patent, so that View could demonstrate why there was no infringement. At the last minute, View backtracked, and said the meeting should be their lawyers' office, where Mr. Stern could not inspect the machines themselves.

11. I was asked to telephone View's attorney. I did, and spoke to Mr. Ernie Brooks, now trial counsel for View. He advised that his client would not disclose what their machines did, and instead demanded that RVSI explain why there was infringement. I stated that our opinion was based on what we could learn about View's machines from publicly available information, and View's literature.

12. Mr. Brooks said he wanted to hear exactly why, on an element by element basis, RVSI felt View infringed the '147 patent. I stated that we could not do so in that sort of detail until we learned what View actually did. I also offered that the simplest way to resolve the dispute would be for View to tell us enough to show that the patent was not infringed, and allow RVSI's technical staff to ascertain that what View said was accurate.

13. Mr. Brooks would not provide that information, and said he would not permit his client to give us further information until we first explained our position in writing.

14. In my experience, when someone is accused of infringement, and seeks to avoid suit, they explain why they do not infringe. Asking for an infringement claim chart struck me as a stonewalling tactic which raised my suspicions that View was being deliberately evasive.

15. Although it was not known to RVSI at the time, View had already filed the instant action at the time of my conversation with Mr. Brooks.

16. I informed Mr. Stern of my conversation, and was told that we should not file suit against View, that RVSI would continue to try to discuss the issue on a businessman-to-businessman basis, and that we would be advised if and when further action should be taken.

17. I did nothing more until we heard that RVSI had been sued. At that time, I reviewed the papers served by View, and discussed the issues with Mr. Stern.

18. We discussed the possibility of View's infringement of other patents in addition to the '147 patent. Mr. Stern advised me

BLK02916

that he reviewed the technologies needed to build a 3-D scanning machine and RVSI's patent position in those areas, as well as all information he could gather about View's machines. Since View would not permit access to its actual machines, or operating information, we had to operate in the dark about the internal structure and operation of View's machines.

19. Mr. Stern advised me that, based on all of the above, it was likely that View would infringe the eight patents, and he had no information which would lead him to a different conclusion.

20. Based on all of the above, and our review of the patents-in-suit and View's literature, we prepared the counterclaims herein, and authorized their filing by our local counsel.

21. Since the filing of the suit, I have repeatedly told opposing counsel, and stated in writing, that the infringement position with respect to the patents-in-suit would be re-evaluated once View provided the information needed to determine what its machines do. I also stated that if View clearly did not infringe one or more of the patents, any claim of infringement of that patent(s) would be dropped promptly. It is my understanding that a simple physical inspection of the machines in operation, if permitted earlier by View, could have shown noninfringement of the two patents dropped from this action.

22. Nonetheless, that information has not been forthcoming.

23. It was only as part of View's summary judgment motion that any documentation was received, and that documentation is woefully inadequate to determine infringement or noninfringement.

24. All statements made herein are from my own knowledge and are true, except for those identified as being made upon information and belief, which statements are believed to be true.

25. All statements made herein are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both under Section 1001 of Title 18 of the United States Code.

DATED: April 20, 1995                    Respectfully submitted,


                                         _____
                                         Roger S. Thompson
New York, New York