IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NETWORK CACHING TECHNOLOGY, LLC,

        Plaintiff,

      v

NOVELL, INC, et al,

        Defendants.

                             /

No C-01-2079-VRW

ORDER.

      Plaintiff Network Caching Technology, LLC (NCT) initiated this suit against defendants Novell, Inc, Akamai Technologies, Inc (Akamai), Inktomi Corp, Volera, Inc and Cacheflow, Inc alleging patent infringement. Arguing that NCT's preliminary infringement contentions (PICs) are inadequate, each defendant separately moves to strike NCT's PICs and to dismiss the action. See Docs ## 115, 126, 129, 134. Inktomi also moves to dismiss the complaint based on NCT's lack of standing. See Doc # 92. NCT opposes these motions. See Docs ## 154, 156, 158, 159, 103. For the reasons that follow, the court GRANTS in

part and DENIES in part defendants' motions to strike (Docs ## 115, 126, 129, 134) and DENIES Inktomi's motion to dismiss (Doc # 92).

I

NCT initiated this action on May 29, 2001. See Doc # 1. NCT alleges that defendants infringed NCT's patents for network services software products.[1] The patents at issue describe an algorithm for directing network traffic and speeding up networks by caching (storing duplicate images of data). Applications of the patent technology are particularly useful in internet services (or the "web space") to speed up and control internet traffic at a company's internet site and in intranet services (or the "file system field") to speed up and control traffic within a company's proprietary network.

The defendants' products which allegedly infringe the patents at issue are varied. Defendants Novell, Volera and Inktomi make and sell software products that contain algorithms which allegedly infringe the patents. Defendant Cacheflow manufactures and sells computer equipment, specifically network servers, which allegedly work by themselves and in conjunction with other software to infringe the patents. Finally, defendant Akamai provides services based on its proprietary database of website usage; NCT alleges that Akamai's services infringe the patents at issue.

---

[1] NCT alleges that it is the assignee of four patents at issue in this case: United States patent nos 5,611,049 ('049 patent); 5,892,914 ('914 patent); 6,026,452 ('452 patent); and 6,085,234 ('234 patent).

2

The '049, '014 and '452 patents were originally issued to William Pitts. While invented by Pitts and two colleagues, the rights to the '234 patent were assigned to a company called Inca Technology, Inc (Inca) before the '234 patent issued; Inca is therefore listed as issuee on the face of the '234 patent. Both Inca and NCT have some rights with respect to the patents at issue in this case.

NCT, Inca and William Pitts and his wife, Virginia Pitts, entered into several agreements the effect of which is disputed by the parties. In October 1996, the Pitts granted an exclusive license of the '049, '914 and '452 patents to Inca, including the right to sublicense the patents. See Cooper Decl (Doc # 93) at Exh 8. In December 1998, Inca granted NCT a license under all four patents. See Geyer Decl (Doc # 103) at Exh H.

Finally, in April 2001, Inca, NCT and the Pitts entered into an agreement which canceled the prior agreements between the parties and assigned all interest in the '049, '914 and '452 patents from the Pitts to NCT and all interest in the '234 patent from Inca to NCT. See Cooper Decl (Doc # 93) at Exh 1. Under the agreement, however, Inca retains some rights with respect to the patents at issue. Inca is granted a purportedly nonexclusive license in the "file system field," a portion of the patent space described above, the right to sublicense its proprietary products to others, the right of approval for any license NCT might grant in the file system field and, finally, the right to sue separately in the file system field and to join any suit by NCT regarding the patents at issue. See Agreement,

3

1   Cooper Decl (Doc # 93, Exh 1) at ¶ 3.
2           In February and March 2002, defendants brought to the
3   court's attention discovery disputes regarding, inter alia,
4   NCT's preliminary infringement contentions (PICs).  See Docs ##
5   66-86.  On March 15, 2002, the court held a status conference to
6   discuss the parties' discovery disputes.  At that conference,
7   NCT admitted that it had not reverse engineered defendants'
8   products to determine if the products infringed the patents at
9   issue.  See Tr (Doc # 193) at 41:17-25.  The conference
10  concluded with the court suggesting that NCT revise its PICs to
11  provide more detailed infringement allegations.  See Tr (Doc #
12  193) at 48:10-50:5.  NCT revised its PICs and, based on further
13  discussions with defendants, revised the PICs a second time.
14  NCT now asserts that it has provided in the PICs all the detail
15  available to it at this time.  See NCT Opp (Doc # 158) at 2.
16  Defendants still contend that NCT's PICs are inadequate.  This
17  dispute led to the motions to strike currently before the court.

                                    II
20          Before turning to defendants' motions to strike, the
21  court considers Inktomi's motion to dismiss based on lack of
22  standing.  In its motion, Inktomi asserts that NCT does not
23  retain sufficient rights under the 2001 agreement in the patents
24  at issue to have standing to sue.  See Inktomi Br (Doc # 130).
25  Standing is a prerequisite to this court's subject matter
26  jurisdiction.  See <u>United States v Viltrakis</u>, 108 F3d 1159, 1160
27  (9th Cir 1997).  While the other defendants have not joined in
28  this motion or filed separate motions based on FRCP 12(b)(1),

the court has a duty to investigate its own subject matter jurisdiction; as Inktomi's arguments apply with equal force to all defendants, the court's consideration encompasses all defendants.

In order to sue under 35 USC § 281, a plaintiff must be a patentee. The statute defines a "patentee" as "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 USC § 100(d). While not strictly found within this language, parties not holding title have also been accorded standing in certain limited circumstances. See <u>Abbott Laboratories v Diamedix Corp</u>, 47 F3d 1128, 1130-31 (Fed Cir 1995). Inktomi argues that NCT is not the assignee of the patent rights for the patents at issue. In <u>Waterman v Mackenzie</u>, the Supreme Court held that three types of assignments by the patent owner grant the assignee the right to bring an action for infringement in the assignee's own name: (1) assignment of the entire patent; (2) assignment of an undivided part of the patent right; and (3) assignment of all exclusive rights to the patent in a specific geographic region. 138 US 252, 255 (1891); see also <u>Abbott Laboratories</u>, 47 F3d at 1131 (relying on <u>Waterman</u>).

Here, the agreement provided that the Pitts "assign[ed] to NCT all of their right, title, and interest, including the right to sue for past and future damages from infringing companies" under the '049, '914 and '452 patents. See Agreement (Doc # 93, Exh 1) at ¶ 1. Similarly, Inca "assign[ed] to NCT all of its right, title, and interest, including the right to sue for past and future damages from infringing companies" under

5

the '234 patent. Id at ¶ 2. By the plain language of the agreement, NCT now holds the title to the patents at issue. Inktomi argues that Inca retained sufficient rights under the agreement to make the assignment to NCT a mere license; however, the agreement is specific that all interests in the patents are assigned to NCT and in return, NCT provides a license to Inca limited to the file system field. As the title holder of the patents at issue, NCT has standing to sue in this action.

### III

Having found that NCT has standing to sue for infringement of the patents at issue, the court turns to defendants' motions to strike NCT's second revised PICs and to dismiss the complaint based on non-compliance with Patent LR 3-1. In their opening memoranda, defendants assert that NCT's second revised PICs are inadequate as they rely solely on defendants' white papers and other marketing materials and do not provide the specificity required by Patent LR 3-1. Defendants assert that striking NCT's second revised PICs and dismissing the complaint is an appropriate sanction for NCT's repeated inability to provide adequate PICs. Defendants do not specify under what legal authority they seek the dismissal in their opening memoranda; in their reply memoranda, defendants first argue that FRCP 41(b) provides a basis for the court to dismiss the action for failure to prosecute. See, e g, Inktomi Reply (Doc # 199) at 4. This was error. See William W Schwarzer, A Wallace Tashima and James M Wagstaffe, <u>Federal Civil Procedure Before Trial</u> § 12:107 at 12-30 (Rutter Group

6

Practice Guide, 2000). In addition, defendants provide no argument that dismissal pursuant to FRCP 41(b) is appropriate based on the jurisprudence under that rule. Even without these procedural missteps, the court finds that the sanction of dismissal is premature on this record. The court has no evidence before it that NCT has not attempted to comply with the court's orders and the local rules in this case. NCT has a different view of what these rules entail than do defendants. Until this order, the court's involvement has not definitively determined which party has the correct view. The court therefore declines to dismiss the action at this time.

Defendants term their motions 'motions to strike' based on Patent LR 3-1. Their core argument, however, is that NCT has failed to meet its FRCP 11 obligations and make a reasonable inquiry into the factual basis for the complaint. Essentially, defendants assert that NCT's PICs make clear that NCT did not perform the inquiry necessary and that Patent LR 3-1 requires disclosure, at a minimum, of NCT's reasonable basis for concluding that there was a factual basis for the complaint. NCT counters that FRCP 11 is not a discovery device and its requirements should not be read into Patent LR 3-1. NCT also argues that it has complied with the specificity required by Patent LR 3-1 and, in particular, takes issue with the specificity defendants' request with respect to NCT's means plus function infringement claims.

//

//

**7**

**A**

The court considers first whether FRCP 11 should be read as a minimum standard for the specificity required by Patent LR 3-1. Patent LR 3-1 is a discovery device wherein a party asserting infringement provides preliminary infringement contentions within 10 days of the initial case management conference. See Patent LR 3-1; (describing Patent LR 3-1 as a discovery rule). Patent LR 3-1 states:

> Not later than 10 days after the Initial Case Management Conference, a party claiming patent infringement must serve on all parties a "Disclosure of Asserted Claims and Preliminary Infringement Contentions" * * * which shall contain the following information:
> * * *
> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. * * *
> (c) A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 USC § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.

Patent LR 3-1.

Patent LR 3-1 therefore takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery. As NCT admits, a discovery request requires the NCT to provide the facts currently known to NCT. See NCT Opp (Doc # 158) at 20. Any facts discovered during its prefiling investigation necessarily come within the facts known to NCT. Thus, NCT's factual inquiry under FRCP 11 must be read as coming within the bounds of Patent LR 3-1. Put differently, NCT must provide in

its PICs the relevant facts it obtained in its prefiling inquiry. Thus, the standard of FRCP 11 prefiling inquiry establishes a minimum level of detail that Patent LR 3-1 requires. NCT asserts that it has included all relevant facts in its PICs and cannot amend them again without further investigation. See id at 2. NCT's PICs, therefore, provide an accurate picture of the maximum possible inquiry in which NCT engaged before filing suit.

B

The next issue is whether NCT's PICs demonstrate that NCT performed an adequate prefiling investigation. NCT's PICs rely entirely on defendants' white papers and other marketing materials. NCT admits that it did not reverse engineer any of defendants' products before filing suit. NCT asserts that this standard is not required for FRCP 11 or Patent LR 3-1 and that, in any case, reverse engineering would not provide any more detail than the marketing materials upon which it relies.

FRCP 11 requires that any party make a reasonable inquiry into the applicable facts and law before filing a document. When applied to the filing of a complaint, FRCP 11 requires that the plaintiff investigate the factual and legal basis for the complaint before filing suit. The Federal Circuit has addressed what constitutes a "reasonable inquiry" in several recent cases. See <u>Antonious v Spalding & Evenflo Co</u>, 275 F3d 1066 (Fed Cir 2002)(applying Fourth Circuit law); <u>View Engineering, Inc v Robotic Vision Sys, Inc</u>, 208 F3d 981 (Fed Cir 2000)(applying Ninth Circuit law); <u>Judin v United States</u>, 110

9

1 F3d 780 (Fed Cir 1997)(applying Federal Claims Court law); see
2 also <u>Refac Int'l, Ltd v Hitachi, Ltd</u>, 141 FRD 281 (CD Cal 1991).
3 While the Federal Circuit applies local circuit law to FRCP 11
4 motions, the standard for a "reasonable inquiry" is an objective
5 reasonableness standard in all circuits from which these cases
6 emanated.[2]

7 In <u>View Engineering</u>, defendant filed a counterclaim for
8 patent infringement. Defendant admitted that its basis for
9 asserting the counterclaims was "based solely on [the
10 inventor's] knowledge of the [] patents, [plaintiff's]
11 advertising, and the statements [plaintiff] made to its own
12 customers." 208 F3d at 985. Defendant did not reverse engineer
13 any product because the machines at issue were too expensive to
14 purchase. See id at 985 n5. Defendant also did not perform any
15 claim construction or infringement analysis before asserting the
16 counterclaims. See id at 985. Defendant argued that, as
17 plaintiff refused to provide access to its machine or drawings,
18 defendant could not determine whether plaintiff actually
19 infringed without discovery. See id. In upholding the award of
20 sanctions, the Federal Circuit described what defendant should
21 have done:

> [Defendant] was afforded ample opportunity to construe
> the 120 claims [plaintiff] was eventually accused of
> infringing, * * * to appoint an outside expert to
> review [plaintiff's] machines, to talk to [defendant's]
> sale corps to learn what it knew of [plaintiff's]

---

[2]Other standards, such as whether the complaint must, in fact, be baseless, are different in the Ninth Circuit. Compare <u>Garr v US Healthcare, Inc</u>, 22 F3d 1274 (3d Cir 1994)("a shot in the dark is a sanctionable event, even if it somehow hits the mark.") with <u>In re Keegan Management Co Sec Litig</u>, 78 F3d 431, 434 (9th Cir 1996) (complaint must, in fact, be baseless).

10

>machine - in other words, to conduct some form of reasonable inquiry.

Id at 986.  "Rule 11 * * * [requires a law firm], at a bare minimum, [to] apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted."  Id.

Similarly, in Antonious, the court stated that a plaintiff must compare the accused device with the construed patent claims.  275 F3d at 1074.  In doing so, the plaintiff's lawyer may not rely solely on his client's statements regarding infringement.  Id.  Finally, in Refac Int'l, the court found that because plaintiff did not reverse engineer defendant's products or obtain product schematics before bringing suit, it had not performed a reasonable prefiling inquiry.  141 FRD at 286.

Thus, FRCP 11 requires that a plaintiff compare an accused product to its patents on a claim by claim, element by element basis for at least one of each defendant's products. While the court is reluctant to hold that in all cases such a comparison requires reverse engineering of the defendant's products, the court finds that reverse engineering or its equivalent is required.  NCT has not provided sufficient evidence to convince the court that reverse engineering would not provide more detail regarding any potential infringement; further detail is necessary in this case.  NCT's PICs are replete with vague discussions of the claim terms.  For example, NCT's PICs against Inktomi states in part:

11

> If the memory (NDC buffer) for the shared (network) cache of the Traffic Server appliance (NDC site) does not contain a copy (projected image) of all the requested data, the shared (network) cache (NDC) transmits a request for the requested data downstream to another appliance (NDC site), such as another Traffic Server appliance, that is closer to the server accelerator (NDC server terminator site) for the dataset or a Traffic Server appliance acting as the server accelerator (NDC server terminator site).

This contention simply mimics the language of claim 1 of the '049 patent, step (c)(with the exception of the underlined portion):

> if the NDC buffer of this NDC site does not contain a projected image of all data requested from the stored dataset, <u>and if the NDC site receiving the request is not the NDC server terminator site for the stored dataset,</u> <u>the NDC of this NDC site for the stored dataset,</u> the NDC of this NDC site transmitting a request for data from this NDC site downstream to another NDC site closer to the NDC server terminator site for the stored data set than the present NDC site.

In support of this contention, NCT cites the following marketing literature:

> "If Traffic Server contains a requested document, it serves the document to the end user. If it does not have a document, it acts as a proxy and fetches the content from the origin server on the user's behalf." NCT 012498.
> "Couple cluster technology from Inktomi® scales to support your network traffic loads." NCT 011435.
> "HTTP parent proxy supports hierarchies of Traffic Servers for increased network efficiency." NCT 011436

NCT provides no link between the quoted passages and the infringement contention that simply mimics the language of the claim. The court sees no specific link. For example, NCT provides no explanation of how the proxies described in the literature map onto the claim language. Nor does NCT describe how "couple cluster technology" is relevant. In essence, NCT has provided no further information to defendants than the claim

12

language itself.  This is plainly insufficient.

C

Finally, the court turns to defendants' argument that NCT must provide the specific location of each routine within the software product in order properly to assert its means plus functions claims.  Patent LR 3-1 requires that NCT provide the identity of each structure that performs the claimed function in any means plus function claim.  See Patent LR 3-1(c).  In software patent claims, the structure which provides the means to infringe is the computer or other device programmed with the specific routine within the accused software which performs a specific function.  See <u>WMS Gaming, Inc v International Game Technology</u>, 184 F3d 1339, 1349 (Fed Cir 1999).  In other words, the structure is simply the combination of the computer and algorithm, which then performs the algorithm.  In its PICs, NCT states that the structure which infringes is a computer programmed with the defendants' software.  NCT does not pinpoint which routine or algorithm specifically performs a given function and therefore is the specific algorithm, when programmed into a computer, that constitutes the structure necessary to prove means plus function claims.  In <u>WMS Gaming</u>, the Federal Circuit required the plaintiff to prove its means plus function claim routine by routine.  184 F3d at 1349.  Defendants contend that this means that NCT's means plus function PICs must specify the routine in defendants' software upon which the claim is based.

In this case, the court disagrees.  <u>WMS Gaming</u> provided

13

the standard required for a patentee to prove a means plus function claim in a software infringement case. As NCT's expert explains, the location of individual software routines is not obtainable via reverse engineering. Software programs are modular; routines can be located in several different physical locations without changing the function of the program at all. The only way to pinpoint the specific routine is to analyze the source code, which is solely in the defendants' possession. This is the quintessential case allowing amendment of PICs based on information received in discovery. See Patent LR 3-4(a). While determining that NCT need not specify the particular routine which performs a function, the court does not find that NCT's means plus function claims PICs are adequate. More specificity in the direct contention (rather than simply the structure) is required, as discussed above.

IV

In summary, the court DENIES Inktomi's motion to dismiss (Doc # 92) and GRANTS in part and DENIES in part defendants' motions to strike (Docs ## 115, 126, 129, 134). Insofar as defendants' motions to strike request dismissal of the action, they are denied. The court strikes NCT's second revised preliminary contentions and requires NCT to provide revised preliminary contentions that conform with the requirements of Patent LR 3-1 as discussed in this order by

//
//
//

14

1  September 15, 2002.  All discovery in this action is hereby
2  STAYED until NCT serves its revised preliminary contentions.

5       IT IS SO ORDERED.

      _____
      VAUGHN R WALKER
      United States District Judge