1   Maria K. Nelson (State Bar No. 155608)
    JONES, DAY, REAVIS & POGUE
2   555 West Fifth Street
    Suite 4600
3   Los Angeles, California  90013-1025
    Telephone:    (213) 489-3939
4   Facsimile:    (213) 243-2539

5   Blaney Harper (*Pro Hac Vice*)
    JONES, DAY, REAVIS & POGUE
6   51 Louisiana Avenue, N.W.
    Washington, DC  20001-2113
7   Telephone:    (202) 879-3939
    Facsimile:    (202) 626-1700

8
    Attorneys for Plaintiff
9   NETWORK CACHING TECHNOLOGY, L.L.C.

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14

15  NETWORK CACHING                       Case No.  CV-01-2079 (VRW)
    TECHNOLOGY, L.L.C.,
16                                         PLAINTIFF NETWORK CACHING
              Plaintiff,                   TECHNOLOGY, L.L.C.'S
17                                         MEMORANDUM IN OPPOSITION TO
         v.                                NOVELL AND VOLERA'S MOTION FOR
18                                         PARTIAL SUMMARY JUDGMENT THAT
    NOVELL, INC., VOLERA, INC.,            CLAIMS 1, 2 AND 3 OF THE '234 PATENT
19  CACHEFLOW, INC. AND INKTOMI            ARE NOT ENTITLED TO AN EARLIER
    CORPORATION,                           PRIORITY DATE
20
              Defendants.                  Date:      November 14, 2002
21                                         Time:      2:00 pm
                                           Judge:     Honorable Vaughn R. Walker
22                                         Place:     Courtroom 6, 17th Floor

23

24

25

26

27

28

WA:1512498v1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

I.     APPLICABLE STANDARDS OF LAW........................................... 2

    A.     Summary Judgment .............................................................. 2

    B.     Claim Construction............................................................... 2

    C.     Patent Applications .............................................................. 4

        i)     Continuation-In-Part ................................................ 4

        ii)     Priority Filing Date for CIP Under 35 U.S.C. § 120.................... 5

II.    NOVELL IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ................. 7

    A.     Entitlement  of '234 CIP To '914 Patent Filing Date Is A Question of Fact........................................................................................... 7

    B.     The '914 Patent Discloses '234 Claim Elements as Construed by Novell......... 8

        i)     The '914 Patent NDC is Equivalent to the '234 Patent NI Cache ......... 9

        ii)     The '914 Patent Discloses A Single Stand Alone Cache ...................... 10

        iii)    The '914 Patent Discloses A Transparent Cache ................................ 11

        iv)    The '914 Patent Discloses A Single Network Interface ....................... 13

        v)     The '914 Patent Discloses the Capability to Operate As a Proxy Cache for Web Servers ......................................................... 16

III.   THE '914 PATENT DISCLOSES EACH ELEMENT OF THE '234 CLAIMS AS PROPERLY CONSTRUED ........................................................ 18

    A.     The Network Structure Recited In The Preamble ......................................... 18

    B.     The Network Interface ......................................................... 19

    C.     The File Request Service Module ...................................... 20

    D.     The Cache .............................................................................. 21

    E.     The File Request Generation Module.............................. 21

    F.     The HTTP Protocol ............................................................. 22

CONCLUSION........................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................................ 2

*Aqua-Aerobic Sys., Inc. v. Aerators, Inc.*, 211 F.3d 1241 (Fed. Cir. 2000) ........................... 4

*Arpin v. Santa Clara Valley Transportation*, 261 F.3d 912 (9th Cir. 2001).............................. 2

*Augustine Medical v. Gaymar Industries, Inc.*, 181 F.3d 1291 (Fed. Cir. 1999)...................... 8

*Bell & Howell Document Management Prods. Co. v. Altek Sys.*, 132 F.3d 701 (Fed. Cir. 1997)............................................................................................................................. 4

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615 (Fed. Cir. 1995) ...................................................................................................................... 4

*Bristol-Meyers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368 (Fed. Cir. 2001).......................................................................................................................................... 3

*Brosnan v. Rollerblade, Inc.*, 1998 WL 209155 *4 (N.D. Cal. 1998)....................................... 8

*Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252 (9th Cir. 2001)................................ 2

*Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991)................. 7

*Crown Operations Int'l Ltd. v. Solutia, Inc.*, 289 F.3d 1367 (Fed. Cir. 2002).......................... 2

*DeGeorge v. Bernier*, 768 F.2d 1318 (Fed. Cir. 1985) ............................................................ 3

*E.I. Dupont deNemours and Co. v. Monsanto Co.*, 903 F. Supp. 680 (D. Del. 1995)................ 3, 4

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547 (Fed. Cir. 1997)............ 3

*Enzo Biochem, Inc. v. Gen-Probe Inc.*, 296 F.3d 1316 (Fed. Cir. 2002) ................................ 5

*Fujikawa v. Wattanasin*, 93 F.3d 1559 (Fed. Cir. 1996)........................................................... 7

*Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948 (Fed. Cir. 1993) .......................................... 4

*IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422 (Fed. Cir. 2000)................... 3

*In re Alton*, 76 F.3d 1168 (Fed. Cir. 1996)............................................................................... 7

*In re Kirchner*, 305 F.2d 897 (CCPA 1962)............................................................................. 6

*Karlin Technology Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968(Fed. Cir. 1999) ................ 16

*Kennecott Corp. v. Kyocera International, Inc.*, 835 F.2d 1419 (Fed. Cir. 1987) ................... 6

*Lampi Corporation v. American Power Products, Inc.*, 228 F.3d 136 (Fed. Cir. 2000)............. 6

*Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997)................................. 6, 8

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)................................... 2

*New Railhead Manufacturing, LLC v. Vermeer Manufacturing Co.*, 298 F.3d 1290 (Fed. Cir. 2002) ...................................................................................................................... 7

*Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.*, 804 F.2d 659 (Fed. Cir. 1986).......... 5

*Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570 (Fed. Cir. 1985)................................ 6

*Reiffen v. Microsoft Corporation* 158 F. Supp. 2d 1016 (N.D. Cal. 2001)............................... 6, 7

*Renishaw PLC v. Marposs Societá Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998)................... 3, 4

**TABLE OF AUTHORITIES**
(Continued)

Page

*Rexnord Corp. v. The Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ........................................... 3

*SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107 (Fed. Cir. 1985).......................... 11

*Suntiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327 (Fed. Cir. 1999).................. 5

*Therma Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, (Fed. Cir. 1995)................................... 6

*Toro Co. v. White Consolidated Indus., Inc.*, 199 F.3d 1295 (Fed. Cir. 1999)............................... 3

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998)................................................................... 6

*United States v. Adams*, 383 U.S. 39 (1966) ................................................................................... 4

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991).......................................................... 5

*Waldemar Link, GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556 (Fed. Cir. 1994) .......................... 5

**STATUTES**

35 U.S.C. § 112 ....................................................................... 1, 2, 5, 6, 19, 20, 21, 22

35 U.S.C. § 119(e) ................................................................................................................... 7

35 U.S.C. § 120 .......................................................................................................... 1, 5, 6, 7

35 U.S.C. § 210 ....................................................................................................................... 5

37 C.F.R. 1.53(b) .................................................................................................................... 4

Fed. R. Evid. 702 .................................................................................................................... 4

Federal Rule of Civil Procedure 56(c) ................................................................................... 2

M.P.E.P. § 201.08................................................................................................................... 5

Patent L.R. 4 ........................................................................................................................... 1

1

**TABLE OF ABBREVIATIONS**

2

3   Fagan Decl.     Declaration of Michael S. Fagan in Support of NCT's Opposition to the Motion for
                    Partial Summary Judgment of Novell and Volera that Claims 1, 2 and 3 of the '234
4                   Patent Are Not Entitled to an Earlier Priority Date

5   Geyer Decl.     Declaration of Laura T. Geyer in Support of Plaintiff Network Caching
                    Technology, L.L.C.'S Memorandum in Opposition to Novell and Volera's Motion
6                   for Partial Summary Judgment that Claims 1, 2 and 3 of the '234 Patent Are Not
                    Entitled to an Earlier Priority Date
7
    '914 Patent     United States Patent No. 5,892,914, filed February 26, 1997, Geyer Decl., Ex. A
8
    '234 Patent     United States Patent No. 6,085,234, filed July 23, 1998, Geyer Decl., Ex. B
9
    PTO             United States Patent and Trademark Office
10
    M.P.E.P.        Manual Patent Examining Procedure
11
    col.            column
12
    ll.             lines
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>INTRODUCTION</u>**

2        Plaintiff Network Caching Technology L.L.C. ("NCT") submits this memorandum in

3    opposition to the Motion For Partial Summary Judgment That Claims 1, 2, and 3 of the '234

4    Patent Are Not Entitled To An Earlier Priority Date ("Nov. Mot.") submitted by defendants

5    Novell, Inc. and Volera, Inc. (collectively "Novell").  In their motion, defendants contend that the

6    claims of the '234 patent are not supported by the specification of the '914 patent because that

7    patent does not disclose certain subject matter identified by Novell.[1]  This Court should deny

8    Novell's motion because it i) mischaracterizes the law, ii) improperly construes the claims-at-

9    issue, and iii) fails to show an absence of a genuine issue of material fact concerning the

10   disclosure of the '914 patent in each of the subject matter areas identified by Novell.

11       Novell mischaracterizes the law when it argues (Nov. Mot., p. 1) that this court may

12   determine as a matter of law whether the claims of the '234 patent are entitled to the priority date

13   of the '914 patent.  The Court of Appeals for the Federal Circuit -- and indeed this Court -- has

14   been clear that the determination of whether an earlier filed patent application has ***sufficient***

15   ***disclosure under*** 35 U.S.C. § 112 to support claims made pursuant to 35 U.S.C. § 120 in a later

16   filed application ***is a question of fact***.  It is Novell's burden to demonstrate the absence of any

17   genuine issues of material fact concerning the disclosure made by the '914 patent.  As discussed

18   below, Novell has failed to carry this burden.

19       In making its argument, Novell misconstrues the claims of the '234 patent by reading into

20   those claims numerous limitations which are not found in the claim language or other intrinsic

21   evidence of the '234 patent (*i.e.*, the '234 specification or file history).[2]  Notwithstanding Novell's

22   ───────────────
         [1] Defendant CacheFlow, Inc. has filed a notice to join in this motion.  CacheFlow has not,
23   however, filed a separate memorandum in support of the motion.  Accordingly, the present
     memorandum by NCT addresses all the issues raised by the defendants.

24       [2] Novell's attempt to have this Court construe the claims of one (1) of the four (4) patents-
     at-issue at this time is improper because such construction is inconsistent with the procedures set
25   out in the Patent Local Rules for claim construction proceedings.  See Patent L.R. 4.
     Nonetheless, because NCT sets forth herein specific factual contentions that demonstrate a
26   genuine issue of material fact in each of the areas cited by Novell, the Court should deny the
     motion on the present record.  To the extent, however, the Court considers it necessary to
27   construe the claims before deciding the present motion, NCT suggests that resolution of this
     motion be deferred until after the Court has made its claim construction ruling to Patent L.R. 4.

28

Case No. CV-01-2079 (VRW)
MEM. OF NCT IN OPPOSITION TO NOVELL AND VOLERA'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1

improper claim construction, and contrary to its factual assertions, the '914 patent does provide a written description as required by 35 U.S.C. § 112 for  i) a stand-alone cache, ii) a transparent proxy cache, iii) a single network interface and iv) a proxy cache for web servers using HTTP as a protocol.  Therefore, because Novell has not carried its  burden to demonstrate an absence of a genuine issue of material fact, this Court should deny Novell's motion for partial summary judgment.[3]

## I.   APPLICABLE STANDARDS OF LAW

### A.   Summary Judgment

Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is only appropriate when "there is no genuine issue as to any material fact and if the moving party is entitled to summary judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The ***burden*** of demonstrating that i) no genuine issue of material fact exists and ii) a party is entitled to judgment as a matter of law ***is on the moving party***.  *Arpin v. Santa Clara Valley Transportation,* 261 F.3d 912, 919 (9th Cir. 2001).  The court must ***view all facts*** and draw all reasonable inferences ***in favor of the non-moving party*** in order to ascertain whether a genuine issue of material fact exists.  *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001); *Crown Operations Int'l Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).

### B.   Claim Construction

To determine whether a claim is supported by a patent specification, the meaning of the claim must first be ascertained.  Claim interpretation is entrusted to the Court as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-79 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  To ascertain the scope and meaning of patent claims, three intrinsic sources should be considered: i) the claims themselves, ii) the specification, and iii) the prosecution history.  *See Markman*, 52 F.3d at 979.  The words of the claims provide the ultimate definition of

---

[3] In an attempt to distract the Court from the issues at hand, Novell references yet-to-be motions made and hypothetical resolutions of the case.  Nov. Mot., p. 2, fn. 1.  Such unsupported references are clearly improper and should be ignored.

the scope of the protected invention.  *Renishaw PLC v. Marposs Societá Per Azioni*, 158 F.3d

1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all

cases with the actual words of the claim.").  "[A] construing court does not accord the

specification, prosecution history, and other relevant evidence the same weight as the claims."

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997).

"[A]s a general rule, all terms in a patent claim are to be given their plain, ordinary and

accustomed meaning to one of ordinary skill in the relevant art."  *Rexnord Corp. v. The Laitram

Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  "Further, patent claim words are given their

ordinary meaning ***in the usage of the field of the invention***, unless the text of the patent makes

clear that a word was used with a special meaning."  *Toro Co. v. White Consolidated Indus., Inc.*,

199 F.3d 1295, 1299 (Fed. Cir. 1999) (emphasis added).  There is no reason to resort to either

other intrinsic or extrinsic evidence in construing a claim if the language on its face has an

ordinary and customary meaning not contradicted by an inventor's definition.

While the language of claim limitations always remains the focus of claim construction,

the preamble language of a claim does not generally limit a claim.[4]  *See DeGeorge v. Bernier*,

768 F.2d 1318, 1322, n.3 (Fed. Cir. 1985) (superseded on other grounds by statute).  In particular,

the preamble of a claim ***does not limit*** the scope of the claim when it merely ***states a purpose or

intended use*** of the invention.  *Bristol-Meyers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246

F.3d 1368, 1374 (Fed. Cir. 2001) (holding that preamble language phrases i) "for reducing

hematologic toxicity", ii) "an antineoplastically effective amount", and iii) "to effect regression of

a taxal-sensitive tumor" are all non-limiting to the claim scope).  Also, to the extent the preamble

merely names the apparatus, the preamble does not operate to limit the claim.  *IMS Technology,

Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) (holding that preamble does

not limit the claims because the "phase 'control apparatus' in the preamble ***merely gives a***

---

[4] A claim preamble refers to the introductory words of the claim, generally appearing before the terms "comprising" or "consisting of".  *See E.I. Dupont deNemours & Co. v. Monsanto Co.*, 903 F. Supp. 680, 693 (D. Del. 1995).

1  *descriptive name* to the set of limitations in the body of the claim that completely set forth the

2  invention").

3        In addition to the claim language, another source of intrinsic evidence concerning the

4  meaning of the claims is the specification.  *Bell Communications Research, Inc. v. Vitalink*

5  *Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) (it is "'fundamental that claims are to

6  be construed in the light of the specifications and both [the claims and specification] are to be

7  read with a view to ascertaining the invention.'") (quoting *United States v. Adams*, 383 U.S. 39

8  (1966)).  While the specification may be used to enlighten or inform existing claim language,

9  *limitations* from the specification (or anywhere else) *may not be read into claims* not having

10  those limitations.  "Thus, a party wishing to use statements in the written description to confine or

11  otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with

12  which to draw in those statements."  *Renishaw PLC*, 158 F.3d at 1248.  "It is *improper* for a court

13  to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to

14  interpret what the patentee meant by particular words or phrases in the claim."  *Hoganas AB v.*

15  *Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) (*citing E.I. Dupont deNemours & Co. v.*

16  *Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)) (emphasis added).

17        In construing a claim, a court should not normally rely on material other than intrinsic

18  evidence.  Unless the intrinsic evidence is "genuinely ambiguous", it is improper to rely on

19  extrinsic evidence, such as expert and inventor testimony in construing the claim.  *Bell & Howell*

20  *Document Management Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997).  However,

21  under Fed. R. Evid. 702, it is appropriate to receive expert testimony to explain the background

22  technology of the patents-in-suit.  *See Aqua-Aerobic Sys., Inc. v. Aerators, Inc.*, 211 F.3d 1241,

23  1244 (Fed. Cir. 2000).

24        **C.    Patent Applications**

25              **i)    Continuation-In-Part**

26        Patents are granted by the PTO based on applications filed by inventors.  Under applicable

27  regulations, there are several different types of patent applications, including a continuation,

28  divisional and continuation-in-part ("CIP").  *See* 37 C.F.R. 1.53(b).  "A continuation-in-part is an

1   application filed during the lifetime of an earlier nonprovisional application repeating some

2   substantial portion or all of the earlier nonprovisional application and adding matter not disclosed

3   in the said earlier nonprovisional application."  Geyer Decl., Ex. C, M.P.E.P. § 201.08.[5]  "Law

4   and policy *liberally authorize* the filing of [CIP] applications for a number of reasons, whether to

5   enlarge the disclosure to include new technological information, thereby providing the public

6   with knowledge of recent developments or improvements; or to enable more extensive

7   prosecution or improved draftsmanship of specification or claims; or to provide a vehicle for

8   prosecution of non-elected claims."  *Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.*,

9   804 F.2d 659, 663 (Fed. Cir. 1986) (emphasis added).

10                    ii)       Priority Filing Date for CIP Under 35 U.S.C. § 120

11          Under 35 U.S.C. § 120, an inventor may file a patent application, such as a CIP, which

12   claims the benefit of the filing date of an earlier filed application.  The benefit of this earlier filing

13   date for a CIP, however, is only accorded to those CIP claims for which the earlier filed parent

14   application provides a written description under 35 U.S.C. § 112.  *Waldemar Link, GmbH & Co.*

15   *v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).  "A CIP application can be entitled to

16   different priority dates for different claims."  *Id*.

17          The determination of whether the ***written description*** requirement of 35 U.S.C. § 112 has

18   been satisfied ***is a question of fact***.  *See Suntiger, Inc. v. Scientific Research Funding Group*, 189

19   F.3d 1327, 1334 (Fed. Cir. 1999); *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 296 F.3d 1316, 1324

20   (Fed. Cir. 2002) ("compliance with the written description requirement is essentially a fact based

21   inquiry that will 'necessarily vary depending on the nature of the invention claimed.'") (quoting

22   *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)).

23          The factual inquiry concerning whether the written description of a parent application

24   adequately discloses the claimed invention in a later filed CIP is viewed from the vantage point of

25   one of skill in the art.  To obtain the priority filing date of the earlier application, the earlier

26

27          [5] The earlier filed application, on which the continuation, divisional, or CIP is based, may
be referred to as a "parent" application.

28

1  application "must reasonably convey to one of skill in the art that the inventor possessed the later-

2  claimed subject matter at the time the parent application was filed."  *Tronzo v. Biomet, Inc.*, 156

3  F.3d 1154, 1158 (Fed. Cir. 1998); *see also Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d

4  1570, 1575 (Fed. Cir. 1985) (the proper inquiry is whether the parent application "reasonably

5  conveys to the artisan that the inventor had possession at that time of the later claimed subject

6  matter.").

7       There is no requirement that the CIP and parent application contain the exact same

8  description of an invention.  "In order to satisfy the written description requirement, the

9  disclosure as originally filed ***need not*** provide *in haec verba* support for the claimed subject

10  matter at issue."  *Lampi Corporation v. American Power Products, Inc.*, 228 F.3d 1365, 1378

11  (Fed. Cir. 2000) (emphasis added).  Rather, the parent application need only "provide an

12  ***equivalent description*** of the claimed invention ***through use of other descriptive words***,

13  'structures, figures, diagrams, formulas, [and so forth]'."  *Reiffen v. Microsoft Corporation* 158 F.

14  Supp. 2d 1016, 1023 (N.D. Cal. 2001) (emphasis added) (quoting *Lockwood v. American*

15  *Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).

16       It has long been recognized that "compliance with section 120 'does not require that the

17  invention be described in the same way, or comply with section 112 in the same way, in both

18  [parent and CIP] applications.'"  *Kennecott Corp. v. Kyocera International, Inc.*, 835 F.2d 1419,

19  1422 (Fed. Cir. 1987) (quoting *In re Kirchner*, 305 F.2d 897, 904 (CCPA 1962) (finding that

20  "disclosure in a subsequent patent application of an inherent property of a product does not

21  deprive that product of the benefit of an earlier filing date.")).  Claim elements may be inherently,

22  rather than explicitly, disclosed in a description of an invention to support an earlier filing date

23  under § 120.  *Therma Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 992-93 (Fed. Cir. 1995)

24  (affirming finding that CIP was entitled to earlier filing date because added disclosure concerning

25  depth of fibers was inherently disclosed by the description in parent application of a mold used to

26  form the fibers).  While inherency must be established by evidence showing that the missing

27  descriptive matter is necessarily present, where a "disclosure is sufficient to show that the natural

28  result flowing from the operation as taught would result in the performance of the questioned

1  function, it seems to be well settled that the disclosure should be regarded as sufficient."

2  *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991).[6]

3  ## II.   NOVELL IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT

4  ### A.   Entitlement of '234 CIP To '914 Patent Filing Date Is A Question of Fact

5  Novell contends that the '234 CIP patent is not entitled to the June 3, 1992, priority date of

6  the '914 patent. Nov. Mot., p. 3.[7]  In recently denying a motion for summary judgment

7  concerning whether a CIP is entitled to an earlier filing date, this Court clearly set out the proper

8  analysis to be undertaken – to wit, the CIP "'need only reasonably convey to persons skilled in the

9  art that the inventor had possession of the subject matter in question'." *Reiffen*, 158 F. Supp. 2d at

10  1025 (quoting *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1570 (Fed. Cir. 1996)).  In *Reiffen*, this

11  court recognized that such a determination *is a question of fact*. *Id.* at 1023.

12  In spite of the clear law on this issue, Novell argues that this Court may make a

13  determination concerning the priority date of the '234 patent claims as a matter of law.  Nov.

14  Mot., p. 1.  Novell mischaracterizes the law.  Its authorities are inapposite to the present case.  For

15  example, in *New Railhead Manufacturing, LLC v. Vermeer Manufacturing Co.*, 298 F.3d 1290,

16  1295 (Fed. Cir. 2002), the Court granted summary judgment that a utility patent was not entitled

17  to the earlier filing date of a provisional application under 35 U.S.C. § 119(e) because the

18  *inventor* had *effectively admitted* that the drawings relied upon did not necessarily disclose the

19  claimed subject matter.  There is no such admission in the present case.  In fact, at the deposition

20  of the invention (Mr. Pitts), he was asked:

21  _____

22  [6] To determine whether inventor timely possessed the claimed subject matter, it is proper to rely on expert declarations offering factual evidence explaining why one of skill in the art would understand the disclosure of the earlier filed application supports the claims-at-issue. *In re Alton*, 76 F.3d 1168, 1174-75 (Fed. Cir. 1996).  Whether a limitation is inherently disclosed is also a question of fact.  *Continental Can Co.*, 948 F.2d at 1269.

24  [7] Novell cites *Brosnan v. Rollerblade, Inc.*, 1998 WL 209155, *3 (N.D. Cal. 1998) for the proposition that the determination of whether a patent is a CIP is a question of law.  Novell, however, does not dispute that the '234 patent properly claims priority under 35 U.S.C. § 120 as a CIP.  By statute, to claim priority to an earlier filed application, one need only amend the specification to incorporate a reference to the earlier filed application.  35 U.S.C. § 120.  Here, the '234 patent recites that it is a CIP of the '914 patent, which is a continuation of the '049 patent, having an effective filing date of June 3, 1992.  *See* '234 Patent, col. 1, ll. 7-12.

| | | |
|---|---|---|
| 1 | Q: | Okay, Now, do you have -- do you know that the specification, the written |
| 2 | | material of the '234 patent, *is brand new* in that patent, it doesn't appear in whole or part in the earlier patents? |
| 3 | A: | ***No,*** I don't think so.  I think its -- it's different words, but it's the same -- |
| 4 | | it's the same -- ***it's the same concept***. |

5  Geyer Decl., Ex. D, Pitts Depo., 4/11/2002, p. 150 (emphasis added).  Contrary to the facts in

6  *New Railhead*, Mr. Pitts and NCT contend, as discussed *infra* at III, that each element of the

7  subject matter in claims 1-3 of the '234 patent is disclosed in the '914 patent.[8]  Notwithstanding

8  Novell's argument, the case law is clear --  whether claims of the '234 CIP are entitled to the

9  earlier filing date of the '914 patent is a question of fact, and Novell's authorities are not to the

10  contrary.

11  **B.**    <u>**The '914 Patent Discloses '234 Claim Elements as Construed by Novell**</u>

12  Novell's motion is premised on its particular construction of the claims of the '234 patent.

13  According to Novell, claims 1, 2 and 3 of the '234 patent require the following four limitations:

14  - the NI cache must be a single stand alone cache;

15  - the NI cache must have the ability to serve as a transparent cache;

16
17  - the NI cache must include a single network interface that speaks to both client workstations and servers in the same protocol used between the client workstations and the server; and

18
19  - the NI cache must be able to operate as a proxy for an Internet web server
20  that communications with Internet web browsers running on client workstations using HTTP.

---

21      [8] Similarly , in *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir.
22  1997), it was ***undisputed*** that an earlier application was missing a claimed element.  Contrary to
the facts in *Lockwood*, there clearly is a dispute concerning each of the elements in the present
23  case.  Also, in *Augustine Medical v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1303 (Fed. Cir. 1999),
because the inventor did not explain how one of ordinary skill in the art would find support in the
24  language of the earlier application, the inventor's statements were conclusory and did not raise an
issue of material fact.  As set forth *infra*, NCT specifically explains how one of ordinary skill in
25  the art would find support for the '234 claims in the language and drawings of the '914
specification.  Finally, in *Brosnan v. Rollerblade, Inc.*, 1998 WL 209155 *4 (N.D. Cal. 1998), the
26  Court determined that the patentee did not show as a factual matter that an earlier filed patent
disclosed any rollerblade braking system other than the one embodiment in which the braking
27  system was activated by lifting the toe.  In contrast to these facts , the '914 patent of the present
case discloses several embodiments of the invention which support the '234 claims.
28

1   Nov. Mot. p. 12.  Novell's claim construction, however, is improper because it violates a principle

2   rule of claim construction discussed *supra* at p. 4 -- limitations from the specification (or

3   elsewhere) are not to be read into the claims.  Novell has done just that.

4         Nonetheless, assuming Novell's construction for the purposes of this motion only, the

5   facts demonstrate that the '914 patent discloses each of the claim elements of the '234 patent as

6   construed by Novell.  Contrary to Novell's argument (Nov. Mot., p. 19) that "the entire focus and

7   approach of the NDC patents differs from the '234 patent", when one of ordinary skill in the art

8   examines the ***full disclosure*** of the '914 patent, ***each*** of the ***elements*** listed above as construed by

9   Novell are ***disclosed***.  These facts preclude a grant of summary judgment.

10              i)        <u>The '914 Patent NDC is Equivalent to the '234 Patent NI Cache</u>

11        Novell contends that the '234 patent specification is completely different from the '914

12  patent specification and that the two do not have a single sentence in common.  Nov. Mot., p. 1.

13  As discussed *supra* at p. 6 however, to be a CIP of the '914 patent, the '234 patent is not required

14  to use the same words or sentences in describing the same subject matter as disclosed in the '914

15  patent.  Rather, as set forth in detail below, because one of skill in the art would understand that

16  the NDC described in the '914 patent performs all the functions and incorporates all the structure

17  required by the NI cache as recited in claims 1-3 of the '234 patent, the '914 patent NDC is

18  equivalent to the '234 patent NI Cache.[9]  Fagan Decl., ¶ 35.  Accordingly, Novell's argument

19  (Nov. Mot., p. 20, fn. 12) that an "NI Cache cannot be an NDC site" is meritless.[10]

---

20        [9] Novell argues (Nov. Mot., p. 19) that because "internet proxy caching underwent

21  monumental changes during the critical six-year period between the filing date for the NDC
    patents and the filing of the '234 patents", the '914 patent cannot disclose proxy caching.  On the

22  contrary, Novell's argument only highlights how far advanced the work disclosed in the '914
    patent was at the time it was filed when compared with the state of technology in 1992.  The fact

23  is, as set out below, that the '914 patent discloses each of the elements in claim 1 of the '234
    patent which Novell admits covers an internet proxy cache.

24        [10] Novell supports its argument by asserting the NDC is configured as an NDC.  This

25  argument is nonsensical.  While it is true that an NDC site is configured as an NDC site, so is an
    NI Cache configured as an NI cache.  Fagan Decl., ¶ 35.  This is not the issue.  The only issue is

26  whether the NDC as disclosed in the '914 patent has the function and structure of the NI Cache
    claimed in the '234 patent.  Here, as discussed more fully *infra*, that is the case.  Specifically,
    contrary to the assertion of Mr. Schwartz, the NDC can request data from any file server (*see*

27  discussion *infra* at p. 17), the NDC can send requests for data in any industry standard protocol
    (see discussion *infra* at p. 12), and the NDC is a proxy cache (see discussion *infra* at p. 17).

28

1    ii)      **<u>The '914 Patent Discloses A Single Stand Alone Cache</u>**

2         Contrary to Novell's contention (Nov. Mot., p. 20), there is no requirement in the claim

3    language of the '234 claims at issue that the NI cache be a single stand alone cache.  The terms

4    "single" or "stand alone", or their equivalent, do not appear in the claims.  '234 Patent, col. 18, l.

5    28 - col. 19, l. 3.  Novell does not point to any such language in the body of the claim.[11]  Novell's

6    only support for its contention is the inference that when the "file request service module

7    element" is read together with the "network interface element," the claim requires a stand alone

8    cache with no intermediate caching.  Nov. Mot., p. 15.  Contrary to Novell's contention, one of

9    ordinary skill in the art would not, reading those claim elements together, understand that

10   intermediate caching was precluded.  Fagan Decl., ¶ 47.  Also, contrary to ¶ 42 of the Schwartz

11   declaration, because an NI Cache is a proxy cache, one of skill in the art would understand the

12   '234 patent to disclose that one or more caches may be used between the workstation and server.

13   Fagan Decl., ¶ 47.  The single stand alone cache requirement has been added without basis in the

14   claim language or specification.  Accordingly, Novell's claim construction is improper and claim

15   1 of the '234 patent should not be construed to require a single stand alone cache.

16        Based on its improper construction, Novell argues that the "NDC patents do not disclose a

17   single standalone cache."  Nov. Mot., p. 20; Schwartz Decl., ¶ 43.  Rather, according to Novell,

18   the "NDC patents disclose a system that has a ***plurality*** of cooperating NDC caching sites

19   including the NDC Server Terminator Site."  *Id*.  Novell's argument, however is fatally flawed as

20   a matter of fact because Novell ignores explicit material in the '914 specification in which a

21   *single* NDC site between the workstation and the server is disclosed.

22        As illustrated in Figure 2 of the '914 patent, ***any one*** of the NDCs may be directly

23   connected with a workstation through network connections such as 44, 64, 66 or 68.  '914 Patent,

24   col. 12, ll. 33-37.  From this disclosure, it is clear to one of ordinary skill in the art that the

25

---

26        [11] Novell asserts that the preamble language supports its construction.  On the contrary,
     the preamble merely indicates that the NI cache is part of a network.  This network, as noted *infra*
27   at p. 20, operates between a client workstation and server.  Such a network is not limited to a
     single cache and may include multiple NI caches.  Fagan Decl., ¶ 47.
28

1    plurality of sites shown in Figure 2 may be collapsed into a single NDC site operating between a

2    workstation and server.  Fagan Decl., ¶ 48.  The '914 patent expressly discloses just such an

3    embodiment:

4        If an NDC site 24, 26B, 26A, or 22 is **both** the client terminator site **and** the server
         terminator for a request to access data, the NDC data conduit 62 is **contained**
5        **entirely within that NDC site** 24, 26B, 26A or 22.

6    '914 Patent, col. 12, ll. 37-41 (emphasis added).[12]

7        Based on the explicit disclosure in col. 12 and the illustration of Figure 2, contrary to the

8    factual assertions of Mr. Schwartz and the arguments of Novell, one of ordinary skill in the art

9    would understand that the '914 patent discloses that the NDC site operates as a single stand alone

10   cache.  Fagan Decl., ¶ 48.  Therefore, because NCT has shown specific factual evidence that the

11   '914 patent discloses to one of skill in the art that the NDC is a single stand alone cache, as Novell

12   would require in its claim construction, NCT has raised a genuine issue of material fact that

13   precludes summary judgment on the stand alone cache issue.

14                    **iii)        The '914 Patent Discloses A Transparent Cache**

15       Novell asserts that the NI cache in the '234 patent must be a transparent proxy cache.

16   Nov. Mot., p. 16.  By this, Novell means that the client workstations and servers are able to send

17   and receive requests and responses in their native protocol without being modified in any way.

18   *Id.*  To support its construction, Novell points to language in claim 1 concerning the transmitting

19   and receiving functions.  *Id.*  The language concerning these claim functions, however, make no

20   mention of a requirement that a) communications must be in a ***native*** protocol nor that b) the

21   clients or servers ***could not*** be modified in any way.

22       Moreover, while it is true that the '234 specification discloses that one embodiment of the

23   NI cache does not involve any modification of the client workstations or servers, as discussed

24   *supra* at pp. 2-4, claims are not limited to what is disclosed in the specification.  *SRI International*

25   *v. Matsushita Electric Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("If everything in the

26   _____

27       [12] At ¶ 43, fn. 33 of his declaration, Mr. Schwartz asserts that the '914 patent does not
     disclose a single cache site.  He is mistaken as demonstrated by this express disclosure in the '914
     patent.

28

1    specification were required to be read into the claims, or if structural claims were to be limited to

2    devices operated precisely as a specification-described embodiment is operated, there would be

3    no need for claims.")  In the claims of the '234 patent, there is no prohibition against non-native

4    protocols or modifications to the server or workstation. [13]  Fagan Decl., ¶ 49.  Accordingly, the

5    transparency requirement has been merely added by Novell without any basis in the claim

6    language.  Hence, Novell's construction is improper and claim 1 of the '234 patent should not be

7    construed to require a transparent cache.

8           Based on its improper construction, Novell argues that the '234 patent claims require a

9    transparent cache and that the '914 patent fails to disclose transparency.  Nov. Mot., p. 21.  As

10   noted above, transparency requires: (i) the workstation and server are able "to communicate -- as

11   if with each other -- even after the NI cache is placed between the server and client workstations;

12   and (ii) the client workstations and the server do not have to be specifically configured to operate

13   with the NI cache."  Nov. Mot., p. 21.  Again, Novell ignores explicit material in the '914 patent

14   that discloses a transparent cache as defined by Novell.

15          The '914 patent discloses that the NDC is "*independent* of any particular communication

16   hardware and protocol used to implement the LAN 44, and of the filesystem…"  '914 Patent, col.

17   44, ll. 2-5 (emphasis added).  One of ordinary skill in the art would understand that, because the

18   NDCs are independent of communication protocol, they are constructed to respond to whatever

19   industry standard protocol is being used.  Fagan Decl., ¶ 51.  As a result, contrary to Novell's

20   argument (Nov. Mot., pp. 21-22), the client workstations or servers do not require any

21   modifications or special configuration to operate with the NDCs.  Fagan Decl., ¶ 50. [14]

22          Additionally, the '914 patent provides that:

23

24

25         [13] In fact, in one embodiment described in the '234 patent, the server may be upgraded
       depending on the application.  '234 Patent, col. 14, ll. 52-59.

26         [14] Mr. Schwartz confuses a server terminator site with a server.  Schwartz Decl., ¶¶ 24, 49.
27   The '914 patent does disclose that a server terminator site incorporates an NDC.  However, the
     server disclosed in the '914 patent is an unmodified conventional server as discussed *infra* at
28   p. 17.

1
2
3

> The conversion between each native protocol and the DTP messages 52 must be so thorough that client workstations, such as client workstation 42, are ***unable to distinguish any difference*** in operation between an NDC 50 functioning as a server to that workstation and that workstation's "native" server.

4

'914 Patent, col. 12, ll. 15-20 (emphasis added).  One of ordinary skill in the art would understand

5

from this disclosure that the client workstation and server are unable to distinguish any difference

6

in operation when an NDC is inserted between them.  Fagan Decl., ¶ 50.[15]  That is, the

7

workstations and servers communicate in the same way through their native protocol whether the

8

NDC is present or not.  *Id.*[16]

9

Based on the specific disclosure at col. 12, ll. 15-20 and col. 44, ll. 2-5 of the '914 patent,

10

contrary to the factual contentions of Mr. Schwartz and the arguments of Novell, one of ordinary

11

skill in the art would understand that the '914 patent discloses a transparent cache as defined by

12

Novell.  Fagan Decl., ¶ 51.  Therefore, because NCT has shown specific factual evidence that the

13

'914 patent discloses to one of skill in the art that the NDC cache is transparent, as Novell would

14

require in its claims construction , NCT has raised a genuine issue of material fact that precludes

15

summary judgment on the transparency issue.

16

### iv)      The '914 Patent Discloses A Single Network Interface

17

Novell asserts that the NI cache must include a single network interface that speaks to

18

both client workstations and servers in the same protocol.  Nov. Mot., p. 14.  There is nothing,

19

however, in the claim language that requires the protocol used for the server be the same as the

20

protocol used for the client workstations.[17]  The claim language merely states that the network

21
22

---

[15] Because a client workstation cannot distinguish between an NDC and a native server, contrary to Mr. Schwartz' assertions at ¶ 23 of his declaration, there are no modifications to be made at the client workstations.  Fagan Decl., ¶ 50.

23
24
25
26

[16] Novell (p. 21) and Mr. Schwartz (¶¶ 24, 49) contend that the NDCs of the '914 patent communicate with other NDC sites ***only*** through the DTP protocol.  They are mistaken.  The NDCs each have the capability to communicate with a workstation or server in its native (industry standard) protocol.  Fagan Decl., ¶ 51.  Because of this capability, the NDCs can necessarily communicate with each other in an industry standard protocol.  *Id.*  Thus, the NDCs are not limited solely to DTP protocol communication.

27

[17] '234 Patent, col. 18, ll. 37-42.

28

interface receives and responds to "network-file-services protocol requests."  '234 Patent, col. 18, ll. 37-43.  The '234 patent discloses that network-file-services protocol requests comprise a number of different protocol types including SMB, NFS, HTTP or HCP.  '234 Patent, col. 6, ll. 44-48.  As a result, the specific protocol for the server may be different than that used for the workstation.

Also, the '234 patent is not limited to a single network interface.  The claim language only requires a network interface for responding to the client workstation.  There is no requirement that the network interface for responding to the server be the same as the one used to respond to the client.  In fact, Figure 6 of the '234 patent illustrates *two* network interfaces and the specification discloses that the NI Cache may have as many network interfaces as network connections.  '234 Patent, col. 8, l. 62 - col. 9, l. 2.  Moreover, while the '234 patent specification does describe an embodiment in which the protocol for the server and workstation are the same, and uses only one network interface, the claims are not limited by the embodiments described in the specification as discussed *supra* at p. 4.  Accordingly, Novell's claim construction is improper and claim 1 of the '234 patent should not be construed to require the single network interface as defined by Novell.

Based on its improper claim construction, Novell argues that claim 1 of the '234 patent "requires a single network interface that handles the NI cache's communications with both client workstations and servers in their native protocol and that the '914 patent fails to disclose this network interface."  Nov. Mot., p. 23.  Contrary to Novell's argument and factual contention (Schwartz Decl., ¶ 35), however, the '914 patent does disclose to one of ordinary skill in the art a single network interface.[18]

---

[18] While Novell improperly attempts to add limitations to the claim phrase "network interface", it does not construe the phrase itself.  One of ordinary skill in the art would understand that the plain language reciting a network interface in claim 1 of the '234 patent refers to a combination of conventional hardware and software where the hardware provides the physical connection to a network and the software transmits and receives information to and from the network via the physical hardware connection using standard protocols.  Fagan Decl., ¶ 26.  The '234 patent describes the network interface in this way.  '234 Patent, col. 6, ll. 49-51.

1    As discussed *supra* at pp. 6-7, the '914 patent need not explicitly describe each claim

2    element in the '234 patent.  Here, the '914 patent does not disclose a network interface *in haec*

3    *verba*.  The '914 patent does disclose, however, NDCs that are connected to a standard network.

4    For example, NDC 24' is connected to Ethernet LAN 44', NDC 26A' is connected to Novelle

5    Netware network 64, and NDC 26B is connected to an SMB network 66 and an NFS network 68.

6    '914 Patent, col. 12, ll. 33-37; Figure 2.  As understood by one of skill in the art, any physical

7    connection of a computer (such as an NDC site) to a standard network necessarily includes a

8    standard network interface consisting of hardware to make the physical connection and software

9    to facilitate communication via the physical connection using standard protocols.  Fagan Decl.,

10   ¶ 54.  One of ordinary skill in the art would understand that the '914 patent necessarily discloses a

11   standard network interface.  Fagan Decl., ¶ 55.

12   Moreover, because the network interface connects to the network, the network interface

13   necessarily communicates to any other device connected to the network, whether client

14   workstation or server.  Fagan Decl., ¶ 54.  Also, the '914 patent expressly provides that the

15   operation of the NDC is "independent of any particular communication hardware and protocol

16   used to implement the LAN 44 and of the file system that is for accessing the hard disks 32, 34

17   and 36."  '914 Patent, col. 44, ll. 3-6.  Because the '914 patent expressly discloses that NDC is

18   connected to a network and the NDC operates independent of a particular network protocol, the

19   necessary, and only reasonable, interpretation of this disclosure by one of ordinary skill in the art

20   is that the NDC incorporates a standard network interface having the capability to communicate

21   with both the workstations and servers in the same protocol.  Fagan Decl., ¶ 55.  Therefore,

22   because NCT has shown specific factual evidence that the '914 patent discloses to one of skill in

23   the art that the NDC incorporates a single standard network interface for communicating with

24   both client workstations and servers, as would be required by Novell's claim construction, NCT

25   has raised a genuine issue of material fact that precludes summary judgment on the single

26   network interface issue.

27

28

1

**v)   The '914 Patent Discloses the Capability to Operate As a Proxy Cache for Web Servers**

2

3    Novell asserts that the NI cache of the '234 patent must be able to act as a proxy cache for

4    an Internet web server using HTTP.  Nov. Mot., p. 18.  Again, Novell reads limitations into the

5    claims which are not present in the language of the claims.  For example, claim 1 does not require

6    the HTTP protocol.  As noted above, the only protocol referred to in the language of claim 1 is a

7    network-file-services protocol which includes a number of protocols.  In fact, because dependent

8    claims 2 and 3 specifically call out HTTP, and claim 1 does not, HTTP is presumed not to be a

9    limitation in claim 1.  *See Karlin Technology Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972

10   (Fed. Cir. 1999) ("limitations stated in dependent claims are not to be read into the independent

11   claim from which they depend").  Furthermore, the claims do not identify any specific type of

12   server (*i.e.*, internet web server).  While the '234 patent specification does describe an

13   embodiment incorporating a web server and HTTP protocol, there is nothing in the language of

14   claim 1 limiting coverage to that embodiment.  Accordingly, Novell's contention that the NI

15   cache is limited to an internet web server using HTTP is improper.

16   Based on its improper construction, Novell contends that, because "the ***only*** server

17   described in the '914 patent is a Server Terminator Site," the '914 patent does not disclose the

18   capability to operate as a proxy cache for a web server.  Nov. Mot., p. 23 (emphasis added).

19   Novell, once again, ignores explicit disclosure in the '914 patent contradicting its contention.

20   In summarizing the process by which NDCs such as those illustrated in Figure 1 operate,

21   the '914 patent discloses that:

22       [i]f the ***NDC buffers*** of this NDC site ***do not contain*** a projected image of ***all data***
23       requested from the dataset, and ***if the NDC site*** receiving the request is the ***server
         terminator site*** for the dataset, ***the NDC*** of this NDC site ***accesses the stored
         dataset*** to project an image of the requested data into its NDC buffers.

24   '914 Patent, col. 7, ll. 40-45 (emphasis added).  The '914 patent also discloses that:

25       [w]hen the NDC ***server terminator site 22*** receives the request, its NDC 50
26       accesses the source data structure.  ***If*** the source data structure resides ***on hard
         disk***, the ***appropriate file system code*** (UFS, DOS, etc.) ***is invoked to retrieve*** the
27       data from the hard disk 32.

28

1   '914 Patent, col. 11, ll. 58-62 (emphasis added).  *See also* col. 14, ll. 60-63.  One of ordinary skill

2   in the art would understand this disclosure to mean that when the server terminator NDC does not

3   have the requested data, the NDC retrieves the data from a source ***other than*** the server

4   terminator site.  Fagan Decl., ¶ 57.  That other source may be hard disk such as that denoted 32 on

5   Figure 1.  *Id*.

6       The '914 patent further discloses that the hard disks may be accessed on a conventional

7   network file server.  Specifically, the '914 patent discloses that the NDC is "independent" of any

8   particular hardware on protocol used to access the hard disk 32.  '914 Patent, col. 44, ll. 2-6.

9   Also, as illustrated in Figure 16, a conventional network file server 300 incorporates hard disks

10  32A" through 32F".  '914 Patent, col. 44, ll. 22-53.  In describing the elements of the network file

11  server 300, the '914 patent recites that "[t]hose elements depicted in Figure 16 that are ***common*** to

12  the digital computer system 20 depicted in Figure 1 carry the ***same reference numeral***

13  distinguished by a double prime ("''") designation."  '914 Patent, col. 44, ll. 23-26 (emphasis

14  added).  That is, the  hard disk 32 depicted in Figure 1 is the same as hard disks 32A" - 32F"

15  depicted in Figure 16.

16      From the explicit disclosure noted above, one of ordinary skill in the art would understand

17  the '914 patent to disclose that i) the server terminator site ***is not*** the only server disclosed in the

18  '914 patent and ii) a conventional network file server, operating in response to conventional

19  communication protocols, is a server from which an NDC server terminator site requests data.

20  Fagan Decl., ¶ 57.[19]  Further, because the NDC server terminator site accesses data from a

21  conventional network file server, and responds to industry standard protocol communication as

22  described *supra* at 12-13, one of ordinary skill in the art would understand that the necessary and

23  only reasonable interpretation of the '914 patent is that the NDC does operate as a proxy cache for

24  a web server.  *Id*.  Therefore, because NCT has shown specific factual evidence that the '914

25

26      [19] Contrary to Novell's argument (Nov. Mot., p. 22) that "the NDC patents do not support
    a cache that can speak multiple network-file-services protocols with the server", because the
27  server disclosed in the '914 patent responds to conventional protocols, the '914 patent does
    disclose this feature.

28

1   patent discloses to one of skill in the art that the NDC operates as a proxy cache, as Novell would

2   require in its claim construction, NCT has raised a genuine issue of material fact that precludes

3   summary judgment on the proxy cache issue.

**III.   THE '914 PATENT DISCLOSES EACH ELEMENT OF THE '234
CLAIMS AS PROPERLY CONSTRUED**

As discussed above, assuming for the purposes of this motion only that Novell's claim

construction of the '234 patent is correct, NCT has shown that Novell has failed to demonstrate an

absence of a genuine issue of material fact for each of the issues it raises.  Nonetheless, to the

extent this court relies on the factual assertions of Mr. Schwartz in construing the claims of the

'234 patent, NCT contends that Novell's claim construction is incorrect.  Furthermore, as set forth

below, the '914 patent discloses each element of the '234 claims as properly construed.

**A.   The Network Structure Recited In The Preamble**

The preamble of claim 1 of the '234 patent is divided into two parts.[20]  A first part -- "A

network-infrastructure cache for providing proxy services to a plurality of client workstations

concurrently requesting access to data stored on a server" -- the plain language of which would be

understood by one of skill in the art to merely provide a descriptive name for the claimed device

and to describe its intended use.  Fagan Decl., ¶ 25.[21]  The second part of the preamble of claim 1

describes the network structure within which the NI cache operates.  One of ordinary skill in the

art would understand from the plain language of this part of the preamble that this structure

includes two client workstations, a server, and a network of which the NI cache is at least a part,

and where the network communicates between the clients and the server using standard

communication protocols.  Fagan Decl., ¶ 25.[22]

---

[20] The preamble is recited at col. 18, ll. 28-36 of the '234 patent.

[21] As noted *supra* at pp. 3-4, where a preamble either provides a descriptive name, or merely states an intended use of the device, the preamble language does not limit the claim.

[22] This construction is consistent with the '234 patent specification which recites that:  "A network interconnects the client workstations and the server so client workstations may transmit network-file-services-protocol requests to the server, and so the server may transmit network-file-services-protocol responses to requesting client workstations."  '234 Patent, col. 5, ll. 17-21.  It is also consistent with the '234 patent specification at col. 5, ll. 27-36 where the NI cache is

Case No. CV-01-2079 (VRW)
MEM. OF NCT IN OPPOSITION TO NOVELL AND VOLERA'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1         In Figure 2 and in the specification at col. 12, ll. 25-41, the '914 patent discloses the

2    network structure required by the preamble of the '234 patent claims-at-issue.  As shown in

3    Figure 2, the network (44), including one or more NDC sites (22, 26, 24) forms a high speed

4    conduit that communicates between multiple workstations and the NDC server.[23]  Fagan Decl.,

5    ¶ 37.  Moreover, as discussed *supra* at p. 17, because i) the NDC server terminator site accesses

6    the source data from hard disk storage and ii) the conventional file server disclosed in the '914

7    patent incorporates the hard disk, one of ordinary skill in the art would understand that the server

8    element of claim 1 in the '234 patent is necessarily disclosed in the '914 specification.  Fagan

9    Decl., ¶ 37.  Therefore, the '914 patent provides a written description of the claimed network

10   structure as required by 35 U.S.C. § 112.

11        **B.**    <u>**The Network Interface**</u>

12        The plain language of the "network interface" element of claim 1 of the '234 patent would

13   be understood by one of ordinary skill in the art to be a combination of conventional hardware

14   and software in which the hardware provides a physical connection from the NI Cache to a

15   network and the software transmits and receives information to and from the network using

16   standard protocols.[24]  Fagan Decl., ¶ 26.[25]

17        As discussed *supra* at p. 15, the '914 patent discloses that the NDC site communicates

18   with a client workstation via a conventional connection to a local area network ("LAN") and that

19   the NDC sites (22', 24', 26A', 26B') are connected to networks 44, 64', 66', or 68'.  As understood

20   by one of skill in the art, any physical connection of a computer (such as an NDC site) to a

21

22   _____

    (continued…)

23   described as part of the network and with col. 2, ll. 4-12 where the network-files-services-
    protocols are described as industry standard.

24
       [23] Although Figure 1 illustrates only one client workstation, the text describing Figure 2

25   recites "workstations" as plural.  '914 Patent, col. 12, ll. 29-30.

       [24] The network interface element is recited at col. 18, ll. 37-43 of the '234 patent.

26
       [25] This construction is also consistent with the '234 patent specification which recites:

27   "The NI cache 100 includes a network interface 102 that provides both a hardware and software
    interface to the network connection 58.  '234 Patent, col. 6, ll. 49-51.

28

1    network necessarily includes a network interface consisting of hardware to make the physical

2    connection and software to facilitate communications using standard protocols.  Fagan Decl.,

3    ¶ 38.  Because the '914 patent discloses a conventional network connection, one of skill in the art

4    would recognize that the necessary and only reasonable interpretation of the '914 patent is that it

5    discloses a network interface.  *Id*.  Therefore, the '914 patent provides a written description of the

6    claimed network interface as required by 35 U.S.C. § 112.

7        C.    **The File Request Service Module**

8        The plain language of the "file-request service-module" element of claim 1 of the '234

9    patent would be understood by one or ordinary skill in the art to be software that receives

10    network-file-services-protocol requests from client workstations, and transmits network-file-

11    services-protocol responses to client workstations.[26]  Fagan Decl., ¶ 27.[27]  The protocol (*i.e.* set of

12    rules for communication) used by this software is an industry standard such as SMB, NFS, HTTP,

13    or NCP.  *Id.*[28]

14        The '914 patent recites that when a request is made from a client workstation, "an NDC

15    client intercept routine 102… inspects the request…"  '914 Patent, col. 11, ll. 15-17.  Also, when

16    a response has been generated, the client intercept routine 102 "packages the returned data and

17    metadata into an appropriate network protocol format… and sends the data and metadata back to

18    the client workstation."  '914 Patent, col. 12, ll. 7-10.  From this disclosure, one of ordinary skill

19    in the art would understand that the client intercept routine 102 is software for receiving requests

20    from, and transmitting responses to, the client workstation in the protocol of the workstation.

21    Fagan Decl., ¶ 40.  Therefore, the '914 patent provides a written description of the claimed file

22    request service module as required by 35 U.S.C. § 112.

23

24

_____

25        [26] The file-request-service-module element is recited at col. 18, ll. 43-50 of the '234
     patent.

26        [27] This construction is consistent with the '234 specification at col. 5, ll. 28-36.

27        [28] This construction is consistent with the description in the '234 patent specification at
     col. 2, ll. 4-12.

28

1

### D. The Cache

The plain language of the "cache" element of claim 1 would be understood by one of ordinary skill in the art to be a portion of computer memory and a conventional set of programs for storing data and transmitting data to and from the memory.[29] Fagan Decl., ¶ 28.[30]

The '914 patent discloses a pool of NDC buffers 128 and a buffer search routine 126. The buffer pool 128 stores data and the buffer search routine searches the buffer pool 128 and prepares a response based on the search result. '914 Patent, col. 15, ll. 4-18; 37-40. From this disclosure, one of ordinary skill in the art would understand that the buffer pool 128 and buffer search routines 126 are a cache. Fagan Decl., ¶ 41. Therefore, the '914 patent provides a written description of the claimed cache element as required by 35 U.S.C. § 112.

### E. The File Request Generation Module

The plain language of the "file-request-generation-module" element of claim 1 would be understood by one of ordinary skill in the art to be software that i) transmits requests to the server when data is not in the cache, ii) receives responses (including requested data) from the server, and iii) transmits requested data to the cache.[31] Fagan Decl., ¶ 29.[32] The requests and responses are transmitted using an industry standard protocols. *Id.*[33]

The '914 patent recites that "if the NDC server terminator site 22 lacks requested data, it invokes one of the file system interface routines 112… to obtain the needed data." '914 Patent, col. 14, ll. 60-63. The '914 patent also discloses that "[t]he file system interface routines 112 route data between the disk drives 32A, 32B and 32C illustrated in Figure 3 and the NDC data

---

[29] The cache element is recited at col. 18, ll. 52-56 of the '234 patent.

[30] This construction is consistent with the description in the '234 patent specification at col. 7, ll. 13-22 describing the cache as including conventional RAM for data storage and with col. 5, ll. 37-41.

[31] The file request generation module element is recited at col. 18, ll. 57-65 of the '234 patent.

[32] This construction is consistent with the '234 patent specification at col. 5, ll. 41-50 which describes these functions.

[33] This construction is consistent with the description in the '234 patent specification at col. 2, ll. 4-12.

1   conduit…"  '914 Patent, col. 14, ll. 7-11.  Further, as discussed *supra* at p. 17, the disk drives are

2   part of a conventional network server.  From this disclosure, one of ordinary skill in the art would

3   understand that the file system interface routines 112 are software for transmitting requests to,

4   and receiving responses from a server and transmitting data to the cache.  Fagan Decl., ¶ 42.

5   Therefore, the '914 patent provides a written description of the claimed file request generation

6   module element as required by 35 U.S.C. § 112.

7        **F.     The HTTP Protocol**

8            Claims 2 and 3 of the '234 patent would be understood by one of ordinary skill in the art

9   to require that the NI cache of claim 1 use the standard HTTP protocol for requests to and/or

10  responses from the client workstation or the server.  Fagan Decl., ¶¶ 31, 33.[34]  The '914 patent

11  discloses that operation of the NDC is "independent" of any particular communication protocol of

12  the client workstation or server.  '914 Patent, col. 44, ll. 2-6.  The '914 patent also discloses that

13  the NDC provides the proper conversions to communicate with the workstations in "industry

14  standard protocols."  '914 Patent, col. 13, ll. 53-60.  From this disclosure, one of ordinary skill in

15  the art would understand that the '914 patent discloses communicating with client workstations

16  and servers in any industry standard protocol.  Fagan Decl., ¶ 44.  HTTP is an industry standard

17  protocol.  *Id*.  Accordingly, the '914 patent provides a written description of the claimed HTTP

18  protocol  as required by 35 U.S.C. § 112.

19                                   **CONCLUSION**

20           To make the pending motion, Novell read a number of limitations into claim 1 of the '234

21  patent which were not based on the language of that claim.  This is improper.  Novell also

22  mischaracterized the nature and scope of the disclosure of the '914 patent by ignoring key aspects

23  of that disclosure.  Contrary to Novell's contentions, the '914 patent does disclose to one of

24  ordinary skill in the art i) a single stand alone cache, ii) a transparent cache, iii) a single network

25  interface, and iv) the capability to operate as a proxy cache for web servers.  Moreover, the NDC

26  _____

27       [34] This construction is consistent with the description in the '234 patent specification at
     col. 2, ll. 4-12 which defines network-file-services protocol as including SMB, NFS, HTTP or
     NCP.

28

1   disclosed in the '914 patent performs all the functions and incorporates all the structure of the NI

2   Cache recited in claims 1-3 of the '234 patent.  For each of the subject matter areas cited by

3   Novell as lacking disclosure in the '914 patent, NCT has set forth facts concerning the claim

4   construction and disclosure of the '914 patent as understood by one of skill in the art that directly

5   contradict the arguments and factual assertions of Novell made in support of its motion.

6   Therefore, Novell has failed to demonstrate an absence of genuine issue of material fact, and this

7   Court should deny Novell's motion for summary judgment that the '234 patent is not entitled to

8   the filing date of the '914 patent.

9

10  Dated: October 24, 2002                             JONES, DAY, REAVIS & POGUE

11

12                                                      By:/s/Blaney Harper
                                                           Blaney Harper

13                                                      Attorneys for Plaintiff
14                                                      NETWORK CACHING TECHNOLOGY,
                                                        L.L.C.

15

16

17

18

19

20

21

22

23

24

25

26

27

28