United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETWORK CACHING TECHNOLOGY, LLC,<br><br>        Plaintiff,<br><br>        v<br><br>NOVELL, INC, et al,<br><br>        Defendants. | No   C-01-2079 VRW<br><br>ORDER |

      Defendants move for partial summary judgment on whether certain of plaintiff's patent claims are entitled to an earlier priority date based on a prior patent.  See Doc #231.  Plaintiff opposes the motion.  See Doc #237.  For the reasons set forth below, the court GRANTS defendants' motion for partial summary judgment that claims 1, 2 and 3 of the '234 patent are not entitled to an earlier priority date (Doc #231).

I

      On May 29, 2001, plaintiff Network Caching Technology LLC (NCT) commenced this action against defendants Novell, Inc,

1  Volera Inc, Akamai Technologies, Inc, Cacheflow, Inc and Inktomi
2  Corporation, alleging infringement of certain NCT patents.
3  Defendant Akamai Technologies, Inc has since been dismissed from
4  this action.  See Notice of Dism (Doc #236).
5       NCT alleges that defendants infringed NCT's patents for
6  network services software products.  NCT alleges that it is the
7  assignee of four patents at issue in this case: United States
8  patent nos 5,611,049 ('049 patent); 5,892,914 ('914 patent);
9  6,026,452 ('452 patent); and 6,085,234 ('234 patent).  The
10 patents at issue describe an algorithm for directing network
11 traffic and speeding up networks by caching (storing duplicate
12 images of data).  Applications of the patent technology are
13 particularly useful in internet services to speed up and control
14 internet traffic at a company's internet site and in intranet
15 services to speed up and control traffic within a company's
16 proprietary network.
17      NCT alleges that Novell, Volera and Inktomi make and
18 sell software products that contain algorithms which infringe
19 the patents.  Cacheflow allegedly manufactures and sells
20 computer equipment, specifically network servers, which work by
21 themselves and in conjunction with other software to infringe
22 the patents.

                                II

25      The '234 patent was filed as a continuation-in-part
26 (CIP) of the earlier '914 patent.  The parties agree that the
27 '914 patent is entitled to a priority date of June 3, 1992.
28 While claims first introduced in the CIP are accorded the filing

date of the CIP application, "matter disclosed in the parent application is entitled to the benefit of the filing date of the parent application." Waldemar Link v Osteonics Corp, 32 F3d 556, 558 (Fed Cir 1994) (citing Litton Sys, Inc v Whirlpool Corp, 728 F2d 1423, 1428 (Fed Cir 1984)).

The relevant statute provides:

> An application for patent for an invention disclosed * * * in [a patent] application previously filed in the United States * * * which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

35 USC § 120.

"Although [the applicant] does not have to describe exactly the subject matter claimed, * * * the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed." Wang Laboratories, Inc v Toshiba Corp, 993 F2d 858, 865 (Fed Cir 1993) (quoting Vas-Cath Inc v Mahurkar, 935 F2d 1555, 1563 (Fed Cir 1991). Thus, "[t]he test for sufficiency of support in a parent application is whether the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." Id. This inquiry is a factual one. See id.

In the instant case, NCT has alleged that claims 1-3 of the '234 patent are entitled to an earlier priority date based on the '914 patent. Defendants, however, argue that these

3

claims are not entitled to the earlier priority date because the '914 patent does not disclose the claimed subject matter of the '234 patent. Defendants argue that this claim, along with dependent claims 2 and 3, is not entitled to an earlier priority date based on the '914 patent because it is not disclosed therein. In particular, defendants argue that the '234 patent contains four limitations, none of which is disclosed by the '914 patent to a person of ordinary skill in the relevant art:

>    (1) The NI cache ('234 patent) consists of a single, stand-alone cache.
>
>    (2) The cache must operate transparently to the client workstation and the server.
>
>    (3) The cache must include a single network interface that speaks to both client workstations and servers in the same protocol as client workstations and the server use to communicate with each other.
>
>    (4) The cache must be able to act as an Internet proxy cache that communicates with client workstations using the hypertext transfer protocol (HTTP).

While compliance with the written description requirement, as earlier noted, is a question of fact, the meaning given to a patent claim is a matter of law "exclusively within the province of the court." <u>Markman v Westview Instruments, Inc</u>, 517 US 370, 372 (1996). While NCT correctly points out that compliance with the written requirement of section 112 is a question of fact, that is not what defendants dispute. Rather, defendants contend that NCT's '234 patent claims were not disclosed by the '914 patent.

The first step in claim construction is to determine the ordinary and customary meaning, if any, that would be attributed to the term by those skilled in the art. <u>Rexnard</u>

<u>Corp v Laitram Corp</u>, 274 F3d 1336, 1342 (Fed Cir 2001).  While it is proper to use specifications to interpret what a patentee meant by words or phrases in a claim, extraneous limitations appearing in the specification cannot be added.  The Federal Circuit has therefore "consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is <u>meant</u> by a word <u>in</u> a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper. * * * No matter how great the temptations of fairness or policymaking, courts do not rework claims.  They only interpret them."  <u>Intervet America, Inc v Kee-Vet Laboratories, Inc</u>, 887 F2d 1050, 1053 (Fed Cir 1989) (emphasis in original; internal citations and quotations omitted).

As the Federal Circuit has explained, courts are to focus steadfastly on "the disclosures of the applications that count."  <u>Lockwood</u>, 107 F3d at 1571.  "Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed.  <u>It extends only to that which is disclosed</u>."  Id at 1571-72 (emphasis supplied).  "The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification."  Id at 1572.

### A

Defendants contend that claim 1 of the '234 patent

5

requires that the caching system described therein operate transparently.  For this proposition, defendants rely on the language of the claim and the preamble, which supplies an antecedent basis for terms used in the body of the claim.  See <u>C R Bard, Inc v M3 Sys, Inc</u>, 157 F3d 1340, 1350 (Fed Cir 1998). In this patent, the portion of the preamble relied upon by defendants "recites not merely a context in which the invention may be used, but the essence of the invention".  <u>Boehringer Ingelheim Vetmedica, Inc v Schering Plough Corp</u>, __ F3d __, 2003 WL 367880 at *4 (Fed Cir 2003).

        The limiting preamble and the claim provide for the insertion of the cache into a network through which the "client workstations may transmit network-file-services-protocol requests to the server, and via which the server transmits network-file-services protocol responses to requesting client workstations".  See '234 patent (Doc #238, Exh B), at 18:28-35. The claim further provides that the inserted cache "receives and responds to network-file-services-protocol requests from client workstations for data for which the * * * cache provides proxy services".  Id at 36-42.

        By this argument, defendants essentially contend that one of ordinary skill in the part would conclude that the claim's repeated reference to a single network-file-services protocol requires that the cache operate transparently to client workstations.  In other words, when a client workstation transmits a data request, the client cannot discern whether the information received in response came directly from the cache or the server.

6

While the claim refers repeatedly to a "network-file-services-protocol", the court declines to find, as a matter of law, that repeated references to a generic term encompassing several possible implementations necessarily means that the generic term, as used in the claim, must consistently refer to a particular implementation. Furthermore, as NCT points out, the '234 patent claim contains no prohibition against non-native protocols or modifications to the server or workstation.

Defendants attempt to argue that the specification describes, as a "distinguishing characteristic" of the invention, the possibility of inserting the caching system without modification of either the client workstation's pre-existing caching module. See '234 patent (Doc #238, Exh B) at 14:40-49. But this does not directly address the pertinent issue. Regardless of the need to modify a client workstation's pre-existing caching module, defendants' referenced passage does not foreclose the possibility that, under the invention, a client workstation may nevertheless be specially configured so that the inserted cache need not operate transparently.

Defendants also refer to language in the specification that through additional modification of network name services, "unmodified client workstations may be transparently redirected to the NI Cache [or to other networks which include the NI Cache] instead of to the remote file servers" for which caching services are provided. Id at 9:47-55. But this discussion appears in the context of one of three possible means of providing proxy services. Id at 8:53-60. Defendants do not discuss the other two or how they might also require

7

transparency.

Defendants have simply failed to demonstrate their entitlement to summary judgment on this issue. Even assuming arguendo that claim 1 of the '234 patent includes such a limitation, the court cannot conclude as a matter of law that the '914 patent does not also encompass that limitation. The '914 patent expressly discloses, as a best mode for implementation, that (1) requests by the client workstation are made in its native protocol, (2) such requests are then converted by the caching system to another protocol which it understands and (3) "[t]he conversion between each native protocol and the [caching system's protocol] must be so thorough that client workstations * * * are unable to distinguish any operation between an NDC functioning as a server to that workstation and that workstation's 'native' server." '914 patent (Doc #238, Exh A), at 11:13-12:20. This raises, at the least, a genuine dispute whether the '914 patent encompasses transparent caches.

B

Defendants offer largely the same arguments in support of their contention that claim 1 of the '234 patent requires the caching system to communicate with client workstations and servers using the same protocol as used by client workstations and servers to communicate directly with each other. Defendants again rely on repeated references to a "network-file-services-protocol" to argue that the use of a single such protocol by all components of the system is mandated by the patent. Because the

8

1 court has already rejected this argument, the court DENIES
2 summary judgment based on this proferred limitation.

C

5     Defendants argue that claim 1 of the '234 patent
requires that the caching system be capable of acting as a proxy
cache for an internet web server that communicates with client
workstations using hypertext transfer protocol (HTTP).
Defendants point to a requirement in the claim that the caching
system possess a "file-request generation-module," used to
transmit requests for data not already present in the cache to
the server. See '234 patent (Doc #238, Exh B), at 18:56-64.
"Server", defendants contend, is specifically defined in the
patent to include an internet web server communicating via HTTP.
To support their position, defendants rely on a truncated
version of a single sentence in the specification. See Defs Mem
(Doc #231), at 12-13.

    The full sentence along with the preceding sentence,
reads:

> Although the present invention has been described in
> terms of the presently preferred embodiment, it is to
> be understood that such disclosure is purely
> illustrative and is not to be interpreted as limiting.
> For example, <u>the phrase file server, or even just the
> word "server," includes an Internet Web Server that
> communicates with Internet Web Browsers running on
> client workstations using the network-file-service
> protocol HTTP.</u>

'234 Patent (Doc #238, Exh B), at 18:12-19 (emphasis indicating
portion selected for quotation by defendants).

    Thus, the term "server" does not require that the
invention accommodate HTTP requests as an internet proxy cache.

9

1  The specification merely notes that as one possible, albeit
2  preferred, implementation.  This excerpt affords the court no
3  basis on which to hold, as a matter of law, that claim 1 of the
4  '234 patent mandates compatibility with HTTP.  Hence,
5  defendants' motion for partial summary judgment on this ground
6  is DENIED.

### D

Finally, NCT disputes defendants' contention that claim 1 of the '234 patent requires that the caching system consist of a single, stand-alone cache.  NCT further argues that even if claim 1 were so construed, the '914 patent nevertheless covers the '234 patent claim because it discloses a caching system based on a single, stand-alone cache.

#### 1

To demonstrate that the '234 patent discloses only a single stand-alone cache, also referred to as the "NI cache", defendants point to the language of the claim contained in the '234 patent itself.  Claim 1 of the patent asserts invention of "[a] network-infrastructure cache," which comprises "a cache".  See '234 patent (Doc #238, Exh B), 18:28-54.  Furthermore, nothing in the specification discloses a caching system consisting of more than a single cache.

In opposition, NCT relies on an expert declaration, which asserts conclusorily that "[o]ne of ordinary skill in the art would not, reading * * * claim 1 of the '234 patent * * * understand that intermediate caching was precluded."  See Fagan

10

Decl (Doc #239), ¶ 47. These wholly conclusory statements, without any explanation or basis, do not lend support to NCT's position and cannot rescue NCT in the context of summary judgment.

Accordingly, the court concludes that defendants have met their burden to demonstrate that claim 1 of the '234 patent requires a stand-alone cache and turns to whether a stand-alone cache is disclosed by the '914 patent.

2

The '914 patent describes a "network of digital computers that includes a plurality of Network Distributed Cache ('NDC') sites." See '914 patent (Doc #238, Exh A), at 45:55-56 (claim 1, on which claims 1-8 are based); see also id at 47:44-45 (claiming a "network comprising[] a plurality of NDC sites", on which all remaining claims are based). Conceptually, these NDC sites are intermediaries between a client workstation, which makes a request for data, and a server containing the desired data.

"Plurality" is not specially defined within the '914 patent. Hence, the court looks to the ordinary meaning attributed by those skilled in the art. See <u>Texas Digital Systems, Inc v Telegenix, Inc</u>, 308 F3d 1193, 1202 (Fed Cir 2002) ("It has been long recognized in our precedent * * * that dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms.")

As defined by Webster's Third New International

11

1 Dictionary, "plurality" is defined as "the state of being
2 plural" or "the state of being numerous."  The express language
3 of the '914 patent, which describes a "plurality" of caching
4 sites, plainly undermines NCT's contention that the earlier
5 patent disclosed a caching system consisting of a single caching
6 site.
7      NCT argues in opposition that the '914 patent's
8 specifications and drawings provide for the possibility of a
9 single cache system.  Here, NCT also relies on the same expert
10 declaration to argue that the discussion accompanying Figure 2
11 makes it "clear that the plurality of [NDCs] may be collapsed so
12 that a single NDC site operates between a file server and a
13 client workstation - ie, the single NDC operates as a standalone
14 cache."  Fagan Decl (Doc #239), ¶ 48.  Furthermore, NCT points
15 out that the specification explains that if an NDC site happens
16 to be both the origin of the client workstation request <u>and</u>
17 contains the desired data, then the data conduit for that data
18 request resides entirely within that NDC site.
19      These arguments fail to create a genuine issue for two
20 reasons.  First, while the specification provides that an NDC
21 may be connected to an outside network at the same time it is
22 connected to other NDCs or terminating sites, that possibility
23 does not alter the operation of the caching system between the
24 client workstation and file server, which, as noted, is based on
25 a plurality of NDCs.
26      Second, discussion of the possibility that a data
27 request may be fulfilled without resort to a recursive search
28 through other NDC sites does not disclose that the system itself

12

may consist of a single stand-alone cache.  The discussion referenced by NCT merely describes the operation of the caching system in certain circumstances; it offers nothing by way of disclosure that the caching system itself may consist only of a single NDC site.

While it perhaps would have been apparent to one skilled in the art that the caching system disclosed by the '914 patent could easily be adapted to accommodate a system comprised of a single cache, "[t]hat does not solve [NCT's] problem" because NCT "claimed a distinct invention from that disclosed in the specification."  Lockwood v American Airlines, Inc, 107 F3d 1565, 1572 (Fed Cir 1997).

The failure of the '914 patent to disclose this limitation is dispositive of whether claims 1-3 of the '234 patent are entitled to an earlier priority date.  Finding no genuine dispute concerning this issue, the court GRANTS partial summary judgment in favor of defendants on this ground.

### III

In sum, the court GRANTS defendants' motion for partial summary judgment, finding that, as a matter of law, claims 1,2 and 3 of the '234 patent are not entitled to an earlier priority date based on the '914 patent.  In addition, good cause appearing, the court GRANTS Inktomi's administrative request to file under seal Exh 5 to the O'Rourke Declaration, which was submitted in connection with defendant's previous motion to dismiss (Doc #257).  That document contains confidential

//

13

1 information pursuant to the parties' stipulated protective
2 order.  See Protective Order (Doc #87).

4      IT IS SO ORDERED.

```
                                    /s/
                         VAUGHN R WALKER
                         United States District Judge
```